UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

TIMOTHY J. FAST,
on behalf of himself and all
others similarly situated,

       Plaintiff,

v.

CASH DEPOT, LTD.,

       Defendant.

Case No.: 16-CV-1637

## DECLARATION OF CAROL REIS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Carol Reis, declare as follows:

1. I am employed by Cash Depot, Ltd. ("Cash Depot") as the human resources manager. I have been employed with Cash Depot since April 2014.

2. I have personal knowledge of the complaint filed by the Plaintiff, Timothy J. Fast.

3. My position involves responsibility for personnel matters, including the administration of Cash Depot's payroll.

4. In administering its payroll, Cash Depot uses timekeeping and payroll software packages in order to track employees' time and calculate what wages are due and owing to its employees. Cash Depot's timekeeping software package is Time Star. Time Star tracks the hours worked by employees for each workday and workweek and creates "time cards" for each employee. The information on the time cards is uploaded to Cash Depot's payroll processing software, Sage ABRA, for the payroll period in question. Time Star tracks how many hours are worked each workweek and uploads the appropriate information as to how many hours of

overtime are owed during the applicable payroll period. ABRA then calculates the wages owed, along with all deductions including taxes, insurance, etc.

5. As the payroll administrator, I am familiar with Cash Depot's personnel policies and pay practices. During the term of Mr. Fast's employment, Cash Depot paid its field service technicians an on-call premium of $75.00 per week for each week that a technician was on call.

6. For the time period in question in Mr. Fast's complaint (i.e., December 2013 – December 2016), Cash Depot defined its workweek as Sunday through Saturday. Cash Depot had the same workweek for all employees regardless of position or region. With respect to on-call work, Cash Depot defined an "on-call" week as Monday through Sunday. Accordingly, for purposes of overtime calculations, the $75.00 on-call premium needed to be attributed to two separate workweeks (i.e., 6/7 of premium attributed to Monday through Saturday on one workweek and 1/7 of premium attributed to Sunday of following workweek).

7. Cash Depot has two pay periods each month. Cash Depot's first pay period of the month runs from the 1st of the month through the 15th of the month and the second pay period of the month runs from the 16th of the month through the 30th or 31st (i.e., last day) of the month. Cash Depot issues payroll checks on the 20th of the month for the pay period that expires on the 15th of the month and payroll checks on the 5th of the month for the pay period that expires on the last day of the month.

8. Cash Depot pays its field service technicians an hourly rate for all hours worked; it pays overtime at time and a half for all hours worked in excess of forty (40) in any workweek. Cash Depot also pays its field service technicians for all of their commute time to and from home, including any travel and commute time for service calls they had to conduct after regular hours (i.e., during "on call" time). It is my understanding that Cash Depot is not legally required

to pay the technicians for all of their commute time to and from home unless such travel time is after regular hours. In addition, Cash Depot pays field service technicians for all time spent working on behalf of Cash Depot including the technicians' hourly rate for any calls that they received during their "on-call" shifts.

9. Cash Depot does not pay field service technicians a shift premium.

10. Cash Depot only has one non-discretionary bonus program and that program was known as its "Road to 10 Million Bonus Program." Cash Depot only made one payment under such bonus program during the term of Mr. Fast's employment and that payment was made to Mr. Fast in August 2016 in the amount of $700.00. In addition, Cash Depot did not pay bonuses for being available to work "on call"; it only paid on-call premiums to such employees.

11. Per the instructions of Cash Depot's legal counsel, I provided copies of all of our payroll records for January 2013 - February 2017 to Schenck for the purposes of conducting a wage audit to determine whether Cash Depot properly calculated its overtime obligations to employees.

12. At the end of Schenck's audit, Schenck presented our legal counsel with a spreadsheet that summarized its audit findings; the spreadsheet listed each employee (both former and current employees) and the amount due and owing to them for additional overtime compensation. I took the information presented on the spreadsheet and processed such payments through our payroll software during May 2017.

13. We included any overtime wages due and owing to current employees on their May 20, 2017 paycheck; such payments included the interest payments calculated by Schenck. The following week, we processed paychecks for each former employee that was owed overtime wages for the December 2013 through February 2017 timeframe; we issued a total of sixty three

(63) paychecks which included but was not limited to field service technicians. According to Schenck's audit results, Cash Depot owed some employees less than $10.00 in additional overtime compensation; Cash Depot elected to pay such employees $10.00. The total wages paid to both former and current employees, excluding Mr. Fast, was $21,983.53.

14. I processed a separate payroll check from Mr. Fast in the amount of $380.76; the check was cut with our June 5, 2017 payroll.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of August, 2017 at Green Bay, Wisconsin.

/s/ Carol Reis